**TENNESSEE SECURITIES, INC.,**
Petitioner-Appellant (79–1415),

**Tennessee Securities, Inc., et al., Plaintiffs,**

**Charles R. Gaw and Deanna L. Gaw, (79–1416), Lloyd E. Gaw and Jannette A. Gaw, (79–1417), Doyle S. Gaw and Ranelle A. Gaw, (79–1418), Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

Nos. 79–1415, 79–1416, 79–1417 and 79–1418.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 3, 1981.

Decided April 1, 1982.

James T. O'Hare, O'Hare, Sherrard & Roe, Nashville, Tenn., for petitioners-appellants.

M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Richard Farber, John A. Dudeck, Jr., Tax Div., U. S. Dept. of Justice, Lester Stein, Acting Chief Counsel, I. R. S., Washington, D. C., for respondent-appellee.

Before ENGEL and MARTIN, Circuit Judges, and BATTISTI,* Chief District Judge.

BOYCE F. MARTIN, Jr., Circuit Judge.

This appeal from the decision of the United States Tax Court challenges federal income tax deficiencies assessed against petitioners, Tennessee Securities, Inc., Charles

* Honorable Frank J. Battisti, United States Chief District Judge for the Northern District of Ohio, sitting by designation.

R. Gaw, Lloyd E. Gaw, and Doyle S. Gaw. The memorandum opinion of the Tax Court is reported at P–H Memo T.C. ¶ 78,434. Although petitioners raise a number of issues on appeal, we find no error in the decision below and affirm.

Tennessee Securities, Inc., (TSI) is a Nashville broker-dealer firm engaged in the business of underwriting securities distributions and effecting securities transactions for its own account and as an agent for others. It is a closely-held corporation owned principally by the Gaw brothers, who act as the officers and directors of the corporation.

In 1969, Doyle Gaw met Steve Pierce, a successful operator of several franchise stores and a fried chicken retailing company. Pierce had recently formed his own company, Convenience Foods of America, Inc. (CFA) for the purpose of launching a new fast food franchise called "Dine Quick." At that time, Pierce had only one outlet but hoped to join the then swelling ranks of national franchises. Realizing that expansion would require significant financing, Pierce solicited Doyle Gaw's interest in the project with the expectation that Gaw's firm, TSI, might undertake a public offering of CFA stock sometime in the future.

Doyle Gaw visited the one franchise and together with his two brothers concluded that Pierce had a viable idea. They believed that given sufficient initial capital, CFA could, in just a few months, establish a record of financial success and then raise more than a million dollars in a public securities offering. An offering of that size would be a financial boon to Tennessee Securities, which would earn a commission of between nine to thirteen percent of the aggregate value of sale.

In order to secure the necessary initial capital, the Gaws and Pierce arranged a $250,000 loan to CFA from a Nashville bank. On the date of the loan, July 3, 1969, the individual petitioners executed a guarantee of CFA's indebtedness to the bank. The guarantee as written was strictly personal to the Gaw brothers. There was no written agreement by TSI to indemnify the brothers, nor did the corporate minutes or financial reports of TSI reflect any obligation on its part with respect to the loan to CFA. At this time, the Gaws and TSI appear to have owned approximately $34,000 of CFA stock, for which they had paid an average of one dollar per share.

In 1970, CFA failed and Pierce left Nashville without paying the note guaranteed by the Gaws. When the bank sought payment under the guarantee, however, it was TSI, not the brothers themselves, that satisfied the debt. This action stemmed from a meeting of the brothers in their capacity as the TSI board of directors. They decided that because the guarantee was entered into for the development of TSI's future underwriting business, the obligation ought properly to fall upon the company. Thus TSI paid the debt and reported the entire loss as a business bad debt on its federal income tax return. 26 U.S.C. § 166.

Subsequently, the Internal Revenue Service disputed petitioner's characterization of the tax consequences of the CFA venture. First, the Commissioner imputed income to the Gaw brothers in the amount of the guarantee satisfied by TSI. Then, because that income was in effect "spent" by the brothers to satisfy a bad debt, the Commissioner found that the loss deduction accrued not to TSI but to the Gaws individually. Furthermore, the loss was characterized as a nonbusiness rather than business bad debt because the Commissioner concluded that the guarantee was undertaken by the brothers for investment rather than for business reasons.

The distinction between business and nonbusiness debts is more than one of semantics, for under § 166(a) of the Code, losses from a business debt may be used to offset ordinary income while losses from nonbusiness debts are treated as short-term capital losses subject to the restrictions of § 166(d)(1)(B) and §§ 1211 and 1212.

The Commissioner lodged a claim for tax deficiencies against petitioners on the basis of the unreported income and the change in the status of the bad debt. Certain other business expenses deducted by petitioners were also questioned.

The Tax Court upheld the Commissioner. It found that the Gaws had received income in the amount of the guarantee satisfied by TSI, and that the debt created by the guarantee and the concomitant deduction were nonbusiness in nature.

On appeal, petitioners argue that these conclusions are not supported by the evidence. Lloyd Gaw contests as well a negligence penalty which was assessed against him alone. Although we affirm the decision of the Tax Court, two of petitioners' arguments merit discussion. We note at the outset that the Tax Court's findings of fact will not be disturbed unless "clearly erroneous." *Commissioner v. Duberstein*, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960); Fed.R.Civ.P. 52(a).

We first address the issue of the income imputed to the Gaw brothers as a result of TSI's payment of the loan guarantee. The Internal Revenue Code sets out a broad definition of income: "gross income means all income from whatever source derived...." 26 U.S.C. § 61(a). With respect to payments made by a corporation on behalf of a shareholder-employee, the Supreme Court has long held that the discharge of a personal liability by the corporation produces dividend income to the shareholder. *Old Colony Trust Co. v. Commissioner*, 279 U.S. 716, 49 S.Ct. 499, 73 L.Ed. 918 (1929). It is the duty of the trial court to look to the substance of the disputed transaction; the fact that the parties declared no "dividends" will not prevent benefits distributed in a substitute form from being labeled as such. Furthermore, the expressed intent or motive of the corporation is not determinative. *See Sachs v. Commissioner*, 32 T.C. 815 (1959), *affirmed*, 277 F.2d 879 (8th Cir.), *cert. denied*, 364 U.S. 833, 81 S.Ct. 63, 5 L.Ed.2d 59 (1960), in which the payment of fines assessed against shareholders by a corporation were deemed to constitute income to the former. In circumstances not unlike those of this case, the Tenth Circuit, in *Wortham Machinery Co. v. United States*, 521 F.2d 160 (10th Cir. 1975), held that the satisfaction of a personal loan guarantee by the guarantors' closely-held corporation constituted income to the shareholder-guarantors. *Id.* at 164. The test applied was whether the payment conferred an economic benefit upon the shareholders. *Id.* We find that the satisfaction of the personal guarantee by TSI similarly benefited the Gaw brothers. Hence the Tax Court properly imputed income to them in the amount of the debt.

Petitioners vigorously contend that the controlling authority on the income question in this circuit is *Bradford v. Commissioner*, 233 F.2d 935 (6th Cir. 1956). They argue that the Tax Court erred when it failed to apply that case here. In *Bradford*, the Sixth Circuit found that the taxpayer did not receive income when, in exchange for payment of $50,000, a bank retired a $100,000 note she had signed for her husband's benefit. The bank reduced the note at the behest of a bank examiner, who determined that $50,000 of the note had to be written off the bank's books as a bad debt. The court declined to impute income to the taxpayer on the basis of this reduction, reasoning that because the taxpayer had received no consideration when she originally signed the note, the subsequent reduction did not represent a real gain to her. Instead, it was as if the original and certain loss to which she had gratuitously committed herself had been $50,000 rather than $100,000. If, however, the taxpayer had received money or property for undertaking the obligation, the subsequent discounting of the note would have raised the question whether the reduction represented income or was, perhaps, a gift.

A mechanical approach to the Tax Code might have viewed the note's reduction and retirement in isolation from its creation. However, we held it appropriate to look behind the cancellation of the indebtedness to evaluate the circumstances under which it arose. *Id.* at 938. The taxpayer had assumed a portion of her husband's indebtedness solely because of a change in the rules of the New York Stock Exchange which required her husband to reduce his debt load or lose his stock trading privileges. Viewing the transaction as a whole, the

court felt that since there would have been no question of income to Mrs. Bradford if she had been able to discharge $100,000 of her husband's debt for $50,000 on the date of the rule change, she should not now be imputed income because of the lapse of time. *Id.*

The Gaw brothers make two arguments based on *Bradford.* First, they contend that inasmuch as they received no money or property in return for their guarantee of the CFA loan, they, like Mrs. Bradford, realized no income when TSI assumed that obligation. In the alternative, they claim that any consideration they received in exchange for the guarantee was no more than the consideration Mrs. Bradford received when she assumed her husband's debt. That consideration, according to petitioners, was her stake in her husband's financial well-being. Had she not assumed his indebtedness, he could not have complied with the NYSE's membership rules and hence could not have continued in his livelihood. By analogy, the Gaws were attempting to enhance TSI's financial position by helping CFA raise capital in the hope of a future public issue which TSI would underwrite. However, the fault of this second argument is that it ignores a crucial distinction between the Bradfords on the one hand, and CFA and the Gaw brothers on the other.

The assumption by Mrs. Bradford of her husband's debt was not an arms length transaction. From an economic viewpoint, nothing was gained by the Bradfords when the debt was transferred from one spouse to another. Together, as a family unit, they still owed the bank the same amount of money. Viewing the Bradfords as an economic unit might perhaps raise questions of income to them collectively upon the bank's discounting the note. In *Bradford,* however, the court specifically noted that Mr. Bradford's tax liability was not at issue. *Id.* at 939. The point is that there was evidence in that case to negate the idea that Mrs. Bradford received economic consideration in the usual meaning of the term when she assumed her husband's debt. Conversely, in petitioners' case, the consideration received by the Gaws in return for

their guarantee was property in the true economic sense. They guaranteed the loan in exchange for the right of first refusal to underwrite any public offering by CFA. The Gaws weighed the personal risk of having to make good on the guarantee against the gain which would accrue to them personally through CFA's possible employment of them and their firm. It was an arms length commercial transaction. When TSI assumed the personal obligation of the brothers that risk was eliminated. Thus the Gaw brothers, unlike Mrs. Bradford, received consideration for their creation of indebtedness and hence, income when that obligation was extinguished by TSI.

 Since the Gaw brothers realized income, it is axiomatic that the bad debt loss accrued to them and not TSI, because— in fact, if not in form—they spent the "income" they received to satisfy the guarantee. Absent a specific statute to the contrary, a loss deduction may only be taken by the party bearing the expense. *Calvin v. United States,* 354 F.2d 202 (10th Cir. 1965); *Strasburger v. Commissioner,* 327 F.2d 236 (6th Cir. 1964) (per curiam). A more difficult problem is the proper characterization of the CFA bad debt as "business" or "nonbusiness."

 The test for distinguishing the two types of bad debts is found at §§ 166(a) and (d) of the Code and § 1.166–5 of the implementing regulations. These sections focus on the "relation which the loss . . . bears to the trade or business of the taxpayer." Treas.Reg. § 1–166–5(b)(2). If the debt was incurred "in connection with" the taxpayer's business then that relationship is "proximate" and the loss will receive the more favorable tax treatment. The difficulty in making this determination with respect to the Gaw brothers case is their dual status as shareholders and employees of TSI. These interests carry different consequences for tax purposes. Investments made by shareholders are capital, or nonbusiness, in nature. They are paid for in post-tax dollars, and any returns flow directly to the taxpayer in the form of capital

gains. Business expenses, on the other hand, are paid in pre-tax dollars but the returns, if any, must pass through two tax entities, the corporation and the individual.

On the basis of this distinction, Congress has established a symmetry in the Internal Revenue Code. From the individual's perspective, gains from personal investments are taxed more lightly than those flowing through its corporate employer; the treatment of losses is just the reverse. Business rather than investment losses are favored. However, this balance may be upset when a taxpayer who is both a shareholder and an employee loans money to or on behalf of his closely-held corporation. Should the loan prove productive, the corporation will prosper, share prices will increase and the individual will reap the benefits of the loan, beyond its mere repayment, through tax-favored capital gains. In this instance, the returns flow directly to the individual taxpayer as an investor in his own corporation. Hence the loan was made for personal, non-business reasons. Had the debt become worthless, the taxpayer would have been entitled to only a nonbusiness bad debt deduction. Yet the temptation upon the occurrence of that event is to ascribe to the loan a business purpose so as to gain the more favorable business debt deduction. The question then is how the taxpayer would have benefitted if the worthless debt had not gone bad. Would he have in fact benefitted through the corporation as an employee? That is, would the returns have been taken in the form of salary increases or bonuses or would they have accrued as capital gains? Only in the former case may the now bad debt be treated as business related.

The Supreme Court in *United States v. Generes*, 405 U.S. 93, 92 S.Ct. 827, 31 L.Ed.2d 62 (1972), addressed this question and adopted an objective test to distinguish between business and nonbusiness loans. The test seeks to uncover the true nature of the loan's expected benefits so that the correct type of loss may then be applied upon its failure. According to *Generes*, in order to qualify as a business debt, the taxpayer's business purpose in making the

loan had to be the *dominant*, as opposed to just a significant, motivating factor. *Id.* at 103, 92 S.Ct. at 833. In weighing the taxpayer's motivations, the Court cautions against assigning too much weight to the self-serving statements of the taxpayer. Instead, it emphasizes the objective factors surrounding the loan. *Id.* at 104, 92 S.Ct. at 833.

In *Generes*, the taxpayer signed indemnity agreements for his construction company which eventually cost him over $315,000. His initial investment in the company was $38,000 for a 44% interest. In return, he received an annual salary of $12,000. After noting that his after-tax income from the company was only $7,000, the Court concluded that his dominant motivation in signing the agreements was not to preserve his comparatively small salary but was instead to protect his capital investment. *Id.* at 107, 92 S.Ct. at 834. Applying this analysis to the facts of petitioners' case leads us to uphold the Tax Court's conclusion that the dominant motivation of the Gaw brothers was similarly investment oriented.

As of July 1969, the date of the CFA loan guarantee, the Gaw brothers had each invested approximately $80,000 in TSI. From the company they received salaries and bonuses which, in 1969, averaged $85,000. Compensation to the Gaw brothers consisted entirely of salaries and bonuses. No dividends were paid on the TSI stock and capital gains had never been taken as there existed no market for the shares of this closely-held corporation. Furthermore, there is no evidence that TSI was in danger of failing altogether if CFA did not develop its potential as a client. Thus we cannot suppose that the CFA loan guarantee was critical to the preservation of the Gaws' business income.

A *Generes*-type analysis of this case is made difficult by the fact that any estimate of the revenue CFA might have brought TSI is speculative. In its findings of fact, the Tax Court noted that the underwriting commissions charged by TSI ranged from nine to thirteen percent. The court also

spoke of a potential underwriting of one million dollars; the petitioners in their brief speak in terms of two million dollars. The highest commission figure suggested by petitioners, $280,000, still means little absent an estimate of the investment returns which might have accrued to them as a result of the CFA loan guarantee.

Such an estimate must be derived from the return the Gaw brothers might have earned from the sale of their CFA stock. Again, any appreciation of TSI stock is not relevant because of the lack of a market for those shares. As noted earlier, it appears that petitioners owned approximately $34,000 of CFA stock at or near the time of the guarantee for which they paid an average of one dollar per share. If, on the "business" side of the analysis, we are to adopt petitioners' figure of a two-million-dollar offering, we should then assume that CFA would undertake an offering of that size only if it met with very substantial financial success. In that event, the value of CFA shares would probably have increased significantly, which leads in turn to a prospectively large capital gain estimate. This estimate, when balanced against the prospective commission on any offering, could defeat petitioners' contention that the guarantee was business rather than investment related.

The difficulty with this approach is that we, unlike the Supreme Court in *Generes*, have no concrete figures available to us. Any comparison between possible business and investment returns stemming from the CFA guarantee must, as shown above, be entirely speculative. The Tax Court rested its decision on the only factual piece of evidence before it, the size of petitioners' investment in CFA. Under the circumstances of this case, we cannot say the court below erred when it used that figure to determine that the dominant motivation of the Gaw brothers in guaranteeing CFA's loan was not business related. *Commissioner v. Duberstein, supra.*

Finally, we uphold the Tax Court's imposition of the 5% negligence penalty assessed against Lloyd Gaw. The fact that he

was unable to explain farm labor deductions taken for amounts paid to his seven and eight-year-old sons is sufficient alone to justify the penalty. *See Marcello v. Commissioner*, 380 F.2d 499 (5th Cir. 1967).

The decision of the Tax Court is affirmed.