UNIONBANCAL CORPORATION, f.k.a. Union Bank, Successor in Interest to Standard Chartered Holdings, Inc. and Includable Subsidiaries, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 00–70764.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 4, 2001.

Filed Sept. 18, 2002.

Frederick R. Chilton, Jr., Paolo M. Dau, and Ward S. Connelly (on the brief), Paulo Dau (argued), Fenwick & West LLP, Palo Alto, CA, for the petitioner.

Jonathan S. Cohen and Charles Bricken (on the brief), Charles Bricken (argued), Department of Justice, Tax Division, Washington, DC, for the respondent.

Before BRUNETTI, KLEINFELD and THOMAS, Circuit Judges.

Opinion by Judge KLEINFELD; Dissent by Judge THOMAS.

KLEINFELD, Circuit Judge.

This is a tax case regarding availability of a loss deduction to a company whose predecessor-in-interest left. a "controlled group."[1]

## FACTS

The facts are undisputed, because the parties stipulated to them before the Tax Court, but the details are complex. Here is a simplified summary. The Appellant, UnionBanCal, is the successor-in-interest of an American bank that once belonged to a group of affiliated British and American companies, considered a "controlled group"[2] under federal tax law. While a part of this controlled group, the predecessor sold a loan portfolio at a loss to a

---

1. *See* 26 U.S.C. §§ 267(b)(3), 267(f)(1), 1563 (2000).

2. *See id.*

British company in the group, Standard Chartered Bank. A statute barred the predecessor from deducting its loss at that time, because Standard was a member of the controlled group.[3] When the predecessor left the group, the statute still wouldn't let it deduct the loss because Standard still owned the loans and was still in the group; instead, the loss was "deferred."[4] Standard later sold the loans to a party outside of the group, and at that time, the statute provided that the deferred loss could be restored. But the statute wouldn't let the predecessor take the loss as a deduction, because it had left the controlled group before the loans were sold outside of the group. The Commissioner would have let Standard take the loss as a stepped-up basis in the portfolio, but that didn't do Standard, a British firm, any good, because British tax authorities wouldn't recognize the stepped-up basis. Thus UnionBanCal's predecessor incurred a loss, of sorts, when it was part of the controlled group and sold the loan portfolio to Standard, that has never been reflected in any firm's taxes, but has reduced the basis and thereby increased the taxable gain for Standard. The predecessor's $1.7 million tax deficiency, for which UnionBanCal is responsible, is at issue.

The facts are hard to understand without the legal background. Under 26 U.S.C. § 267(a)(1), "No deduction shall be allowed in respect of any loss from the sale or exchange of property, directly or indirectly, between persons" in certain relationships.[5] These relationships include, among others, those between family members,[6] individuals and the corporations they control,[7] the grantors or beneficiaries of a trust and its fiduciaries,[8] and "[t]wo corporations which are members of the same controlled group,"[9] such as corporations in a parent–subsidiary chain.[10]

The statute works like this. Suppose you want to generate a tax loss without a real loss, so you sell to your wife for $80 stock you bought for $100 a share. It won't work. Section 267(a)(1) of the statute won't let you take the $20 per share loss, because of your relationship.[11] But fortunately, when your wife sells the stock on the open market after it's risen to $110, she gets to use your $100 basis, not her $80 basis, to calculate her taxable gain. She gets your basis because, although the statute prevents you from taking the sham loss you generated by selling the stock to her, it also says in section 267(d) that her "gain shall be recognized only to the extent that it exceeds so much of such loss as is properly allocable to the property sold or otherwise disposed of by the taxpayer."[12] This limitation on deductions for transfers between related parties protects the fisc against sham transactions and manipulations without economic substance. Not infrequently, though, there are honest and important non-tax reasons for sales between related parties, so it's important to fairness to preserve the pre-sale basis where loss on the sale itself isn't recognized for tax purposes. Otherwise, the statute would be a heads-I-win, tails-you-lose proposition for the IRS: the seller

3. See 26 U.S.C. § 267(f)(2).

4. Id.

5. 26 U.S.C. § 267(a)(1).

6. Id. § 267(b)(1).

7. Id. § 267(b)(2).

8. Id. § 267(b)(4)-(8).

9. Id. § 267(b)(3).

10. See id. §§ 267(f)(1), 1563(a)(1).

11. See 26 U.S.C. § 267(a)(1).

12. Id. § 267(d).

can't take his loss, but the IRS calculates the buyer's gain on resale using the lower basis.

A variant of this scheme applies to "controlled groups," that is, corporations with interlocking ownership as specified by the statute.[13] Instead of being disallowed under section 267(a)(1), the loss is "deferred" under section 267(f)(2) until one of two conditions pertains: either

(1) "until the property is transferred outside such controlled group and there would be recognition of loss under consolidated return principles"; or

(2) "until such other time as may be prescribed in regulations."[14]

Instead of the buyer getting the benefit of the loss as a stepped-up basis, as in the husband-wife example, the seller takes the loss as a deduction, but not until the buyer sells the property outside of the controlled group or until the regulations otherwise provide. UnionBanCal's predecessor-in-interest was a seller in such a "controlled group" when it sold its loan portfolio to Standard at a loss, and UnionBanCal complains that the IRS improperly denied the predecessor's deduction for that loss.

UnionBanCal's predecessor couldn't take the loss because the predecessor left its controlled group before its buyer within the group sold the property to an outsider. In 1984, the year the predecessor made the sale, the Commissioner of Internal Revenue issued a temporary regulation under section 267(f)(2) governing sales between controlled group members.[15] The temporary regulation provided that "[i]f a selling member of property for which loss has been deferred ceases to be a member when the property is still owned by another member, then . . . that loss shall never be restored to the selling member."[16]

The temporary regulation's "never" limitation still doesn't create a heads-I-win, tails-you-lose situation for the IRS. When, under its provisions, a selling member may "never" take a loss, the regulation falls back on a rule analogous to that in the husband-wife example: the buyer within the controlled group gets to use the seller's higher basis when the buyer resells the property outside of the group. The temporary regulation states: "On the date the selling member ceases to be a member, the owning member's basis in the property shall be increased by the amount of the selling member's unrestored deferred loss at the time it ceased to be a member . . . ."[17] Thus, if UnionBanCal's predecessor-in-interest had bought the property for $100 and sold it to Standard for $80, and then left the controlled group while Standard was still a member, the temporary regulation wouldn't let the predecessor take the $20 loss, but it would let Standard use UnionBanCal's $100 basis, rather than its $80 basis, when it sold the property to an outsider.

In this case, however, because of the international character of the controlled group and the transaction, the temporary regulation really did create a heads-I-win, tails-you-lose situation. UnionBanCal didn't get to take the loss as a deduction because of the temporary regulation's "never" provision. But Standard didn't get to use UnionBanCal's basis, as American law allowed, because British law, which controlled Standard's tax liability, didn't allow it. UnionBanCal argues that

13. See id. §§ 267(b)(3), 267(f)(1), 1563.

14. Id. § 267(f)(2)(B).

15. 26 C.F.R. § 1.267(f)–1T (1984).

16. Id. § 1.267(f)–1T(c)(6).

17. Id. § 1.267(f)–1T(c)(7)(1).

this result demonstrates that the temporary regulation is contrary to both the legislative scheme and the British American tax treaty and that it should be allowed to take its predecessor's loss as a deduction.

In 1995, after UnionBanCal's predecessor left the controlled group and after Standard sold the loan portfolio outside of the controlled group, the Commissioner changed the Treasury Department's position in a way that would have let UnionBanCal benefit from its predecessor's loss, had the change been retroactive. The Commissioner replaced the 1984 "temporary" regulation with a final regulation[18] under which, had it been in effect, UnionBanCal's predecessor-in-interest could have taken its loss from its sale to Standard when it left the controlled group, even though Standard hadn't yet sold the loans outside of the controlled group. The final regulation states that a seller's "loss or deduction from an intercompany sale is taken into account under the timing principles of [26 C.F.R. § 1.1502–13], treating the intercompany sale as an intercompany transaction."[19] Under 26 C.F.R. § 1.1502–13(f) (1995),

> the deferred ... loss attributable to property ... shall be taken into account by the selling member ... [i]mmediately preceding the time when either the selling member or the member which owns

the property ceases to be a member of the group ....[20]

This provision appears to mean that the seller in a controlled group transaction may claim its deferred loss when it leaves the controlled group, even if the buyer has not yet sold the property to an unrelated party[21]—precisely what the former, temporary regulation prohibited. But this 1995 regulation, the benefit of which UnionBanCal seeks, doesn't apply to transactions that took place before July 12, 1995,[22] which means it doesn't apply to UnionBanCal's predecessor's intra-group transaction.

Here, in more detail, are the events giving rise to this litigation:

1984 Union Bank, Appellant UnionBanCal's predecessor-in-interest, was the indirect American subsidiary of a British company, Standard Chartered Bank.[23] Both were members of a controlled group. Union Bank sold a portfolio of loans to foreign countries with a face value of $434.6 million to Standard for $423 million and claimed an $11.6 million loss on its federal tax return.

1988 Union Bank left the controlled group (along with its American parent and indirect parent), and through a series of mergers and acquisitions became UnionBanCal, the Appellant.[24]

---

18. See 26 C.F.R. § 1.267(f)–1 (2001).

19. Id. § 1.267(f)–1(a)(2).

20. Id. § 1.1502–13(f) (1995).

21. See id. §§ 1.267(f)–1, 1.1502–13.

22. Id. § 1.267(f)–1(l)(3).

23. Standard Chartered Bank (a British company) owned all of the stock in Standard Chartered Overseas Holdings, Ltd., which owned all of the stock in Standard Chartered

Holdings, Inc. (an American company), which was the sole shareholder in Union Bancorp, which was the sole shareholder Union Bank.

24. California Bank bought Standard Chartered Holdings, Inc.—of which Union Bancorp was a subsidiary and Union Bank an indirect subsidiary—and liquidated it and its subsidiaries, then changed its name to Union Bank. BanCal Tri–State Corporation owned the Bank of California. BanCal merged into Union Bank. Then Union Bank transferred all of its assets to the Bank of California. Union Bank then changed its name to UnionBanCal.

1989 Standard sold the loan portfolio to an outsider.

1994 The IRS audited Union Bank's 1984 return. UnionBanCal claimed that the loan portfolio was actually worth only about $350.5 million, so its loss was about $84.1 million (face value less economic value at the time of the sale within the controlled group). The IRS took the position that Union Bank wasn't entitled to recognize any loss at all.

1995 Subsequently the IRS and Union-BanCal reached partial settlement. The settlement allowed UnionBanCal to take a $2.3 million loss on its predecessor's 1984 tax return and deferred the rest of the loss. The IRS audited Union Bank's 1988 federal tax return and, citing the "never" provision of the temporary regulation, rejected UnionBanCal's claim that the deferred loss should be applied to the 1988 return.

1996 UnionBanCal requested under the 1975 United States–United Kingdom Tax Convention that British and American "Competent Authorities" determine the loan portfolio's fair market value and the tax treatment for Union Bank's loss.

The Competent Authorities determined that the loan portfolio's fair market value at the time Union Bank sold it to Standard in 1984 was $346.6 million, which was $88 million less than face value, and agreed that $88 million was Union Bank's loss on the sale.

(Standard paid Union Bank only $11.6 million less than face value for the portfolio, not $88 million. So one might think Union Bank's loss was only $11.6 million, because Standard didn't pay fair market value, but $76.4 million above market value, and Union Bank never gave that $76.4 million back. But Standard's overpayment has been treated as a capital contribution, rather than as payment for the loan portfolio, so Union Bank's loss on the loan portfolio is $88 million.)

But the Competent Authorities did not agree on the tax treatment for the loss. The American authority wouldn't allow Union Bank to take the loss because of the temporary regulation; the British authority wouldn't allow Standard an increased basis in the loan portfolio because of British tax law. The result was that both Standard and Union Bank were required to pay taxes as though they hadn't lost $88 million (except for the $2.3 million loss allowed under Union-BanCal's settlement agreement with the IRS).

1997 The IRS issued UnionBanCal a statutory notice of an approximately $1.7 million deficiency relating to Union Bank's 1988 return.

UnionBanCal petitioned the Tax Court for relief, which tried the case on stipulated facts and denied the petition. Union-BanCal appeals the Tax Court's decision to us.

## ANALYSIS

■ We have jurisdiction to review the Tax Court's decision.[25] The facts are stipulated. We review the Tax Court's interpretation of tax code provisions, regulations, and treaties *de novo.*[26]

---

25. 26 U.S.C. § 7482.

26. *Baizer v. Comm'r,* 204 F.3d 1231, 1233 (9th Cir.2000) (construction of tax code); *Ann Jackson Family Found. v. Comm'r,* 15 F.3d

917, 920 (9th Cir.1994) (interpretation of regulations). *See United States v. Idaho,* 210 F.3d 1067, 1072 (9th Cir.2000) (stating that

UnionBanCal challenges the Commissioner's decision on the same grounds rejected by the Tax Court: (1) the 1984 temporary regulation is invalid because it is inconsistent with section 267(f); (2) the temporary regulation is invalid because it violates the United States United Kingdom Tax Convention; and (3) the Commissioner's decision to preclude retroactive application of the 1995 final regulation was not permissible.

## A. Validity of the 1984 Temporary Regulation.

█ UnionBanCal argues that the statute requires two things that the temporary regulation denies: (1) that the loss on a sale between controlled group members must be *deferred,* not *denied;* and (2) that seller's loss in an intra-group transaction must remain for the use of the *seller.* We cannot disagree with the first point: section 267(a)(1) says that loss deductions for sales between the related persons specified in section 267(b) are disallowed, but section 267(f) says that loss deductions for sales between members of controlled groups "shall be deferred."[27] Congress plainly meant to draw a distinction between members of controlled groups and other related parties and to provide for deferral rather than disallowance of losses arising from sales of property within controlled groups.

But UnionBanCal's second point is not persuasive. Section 267(f) says "such loss"—that is, the loss from the sale of property between members of the controlled group—"shall be deferred."[28] The statutory language does not compel the conclusion that once the deferred loss is recognized, the seller must be the one who

gets the tax benefit. Members of a controlled group do not deal with one another at arms length, so the financial and tax consequences of intra-group transactions are entirely controllable and manipulable by the group. When members of a controlled group accomplish an intragroup sale, the price between them is arbitrary and any loss is without economic substance for the group as a whole. So deciding who actually bore the loss in such a transaction is inherently arbitrary.

Since Standard controlled Union Bank and, through intermediaries, owned it, it could buy the depressed loans from Union for face value, for $11 million below fair market value, for $88 million below face value, or for whatever price it believed would best serve the group's financial and regulatory objectives. So the existence and magnitude of any "loss" Union Bank suffered was entirely a matter of Standard's choice and without any practical financial consequences. The words of section 267(f), especially when read in light of the practicalities of controlled group transactions, do not support the inference that the tax benefit of a loss must remain with the purported seller.

The phrase "such loss shall be deferred" in section 267(f) doesn't imply that the purported seller gets the tax advantage of the loss, but that the loss won't be recognized for tax purposes at the time of the sale. This inference is compelled by the phrases that follow "such loss shall be deferred"—"until the property is transferred outside the controlled group" or "until such other time as may be prescribed in regulations."[29] When read together, these phrases show that Congress

appeals court reviews interpretation of treaties *de novo*).

**27.**  26 U.S.C. § 267(f)(2).

**28.**  *Id.*

**29.**  26 U.S.C. § 267(f)(2).

is not assuring the paper seller that, come hell or high water, it gets to use the loss sometime. Rather, Congress is assuring the fisc that, so long as the property remains within the controlled group, the "loss" won't be recognized. After all, so long as the property and both parties to its sale remain within the controlled group, the "loss" is like the loss to your left pocket when you move money to your right pocket, somewhat like a sham transaction, so the general principle that transactions without economic substance will not be recognized for tax purposes supports nonrecognition in these circumstances as well.[30]

Section 267(f) provides alternative dates for when the deferred loss on an intragroup sale may be recognized. The first date is whenever "the property is transferred outside such controlled group and there would be recognition of loss under consolidated return principles."[31] The second date is "such other time as may be prescribed by regulations."[32] This gives the Commissioner authority to prescribe the time for recognition, which is what the Commissioner used to issue the 1984 temporary regulation.[33] As regulations commonly do, this temporary regulation dealt with a complexity not fully covered by the statute: what happens if one member leaves the controlled group before the other member sells the property to an outsider? The temporary regulation provides the answer: if the seller leaves the group before the buyer sells the property to an outsider, the seller's deferred loss "never" gets restored to it.[34] UnionBanCal cries foul over the word "never," and claims it contradicts the statutory command that the loss must be "deferred."[35] But we can't see any inconsistency between this regulation and the statute: the loss still gets "deferred," not disallowed; it just gets recognized by the buyer as a stepped-up basis, instead of by the seller as a deduction. UnionBanCal's complaint is that the loss doesn't get restored to the seller, but as we've discussed, the statute doesn't require that result. As the Tax Court below put it, "Under the literal language of the statute, ... what is deferred under section 267(f)(2)(B) is not the seller's recognition of the seller's loss, but rather the 'loss' itself."[36]

Under the temporary regulation, the deferred loss stays with the property until the property leaves the controlled group. This is consistent with the general scheme of section 267. Under section 267(d), which provides for the recognition of losses disallowed under section 267(a)(1), recognition of the loss follows the property.[37] Under section 267(a)(1) and (d), when a husband sells stock to his wife, as in the hypothetical case we set out earlier, he doesn't get the loss when the wife calls a stockbroker and sells the stock—she gets the gain or loss on her sale, but gets to use his basis. The recognition of the loss follows the property, and gets triggered

---

30. *Cf. Sacks v. Comm'r of Internal Revenue*, 69 F.3d 982, 986 (9th Cir.1995) ("It has long been the law that a transaction with no economic effects, in which the underlying documents are a device to conceal its true purpose, does not control the incidence of taxes.").

31. 26 U.S.C. § 267(f)(2)(B).

32. *Id.*

33. 26 C.F.R. § 1.267(f)–1T (1984).

34. *Id.* § 1.267(f)–1T(c)(6).

35. 26 U.S.C. § 267(f)(2)(B).

36. *UnionBancal Corp. v. Comm'r of Internal Revenue*, 113 T.C. 309, 321, 1999 WL 962587 (U.S. Tax Court 1999).

37. *See* 26 U.S.C. § 267(d).

when the property goes to an unrelated party. Likewise, the temporary regulation makes recognition of the deferred loss follow the property and stick with it until the property is sold to an outsider: "the loss is preserved within the group because no member of a group should under section 267(f) be able to recognize a loss while the group continues to hold property it purchased from itself."[38] True, Congress defers recognition of losses for controlled groups,[39] instead of disallowing them as with the husband and wife example.[40] But the distinction between disallowance and deferral is not so sharp because in both cases *who* gets the tax benefit doesn't matter because of their identity of interest; it's *when* the loss gets recognized that matters. There's no reason why Congress should care about *who* gets the loss when the parties are so closely related or controlled, but Congress has a great concern with *whether there is a real loss.*

> The primary rationale for deferring loss on transfers between members of the same group is to prevent the premature recognition of loss merely because the property is transferred to a related person .... [A]n ancillary rationale for deferring loss is to prevent artificially increasing the amount of a loss taken by a member on the sale or exchange of property at less than fair market value to another member .... [41]

UnionBanCal argues that the legislative history shows that Congress intended something contrary to what the temporary regulation says. UnionBanCal cites a passage in the House Conference Committee Report saying that Congress wanted losses on sales within controlled groups subject to "deferral (rather than denial)."[42] This legislative history adds nothing whatsoever to what the statute plainly says. True, a Senate Finance Committee Report says that the bill was intended to defer recognition until the property was sold to an outsider "or the parties are no longer related."[43] That would imply recognition as soon as UnionBanCal's predecessor left the controlled group, contrary to the temporary regulation. But the law—the bill that was passed by both houses of Congress and signed by the President[44]—doesn't say "or the parties are no longer related." It says "or until such time as may be prescribed by regulations."[45]

■ UnionBanCal argues that the Temporary Regulation is arbitrary and capri-

**38.** 49 F.R. 46992, 46994 (1984).

**39.** 26 U.S.C. § 267(f)(2).

**40.** *See id.* § 267(a)(1).

**41.** 49 F.R. 46992, 46994 (1984).

**42.** H.R. Conf. Rep. 98–861, at 1033 (1984), *reprinted in* 1984 U.S.C.C.A.N. 1445, at 1721

**43.** *Senate Committee on Finance, 98th Congress, Explanation of Provisions Approved by the Committee on March 21, 1984,* Vol. I (Comm. Print 1984), *reprinted in* S. Prt. 98–169, at 496.

**44.** *See* U.S. Constitution, article I, section 7. *See also Puerta v. United States,* 121 F.3d 1338, 1344 (9th Cir.1997) ("The legislative history suffers the usual infirmity, that it was not passed by both houses of Congress and signed into law by the President. For that reason, it is not the law."); *Hoonah Indian Association v. Morrison,* 170 F.3d 1223, 1228 (9th Cir.1999) ("The fact that such good 'legislative history' is available for both sides of the argument illustrates how easily it may be created by advocates of one position or the other during the legislative process who did not get their views into the statutory language, and also why it is so frequently a waste of time to use it to construe the statute. Better guidance is available from the words of the law duly passed and signed."); *see also Burns v. Stone Forest Industries, Inc.,* 147 F.3d 1182, 1184 (9th Cir.1998).

**45.** 26 U.S.C. § 267(f)(2)(B).

cious because it allows recognition "to the wrong party at the wrong time." We reject this argument because, so long as the controlled group maintains its existence, it is within the group's control which party within it bears the paper loss. As for when the loss is recognized, one could reasonably choose either alternative, when the property is sold to an outsider, as the temporary regulation provides,[46] or when the seller leaves the controlled group, as the final regulation provides.[47] While they are together in the controlled group, and when they agree on terms for ending membership in the group, the parties can avoid unfairness to themselves from the way the taxes fall by adjusting their affairs in accord with tax regulations.

■   UnionBanCal argues that we ought not to defer to the regulation because, as a

temporary regulation, it was adopted without notice and comment.[48] We need not decide generally whether absence of notice and comment would affect the degree of deference to a temporary regulation adopted by the Commissioner of Internal Revenue (which may differ from other temporary regulations issued by agencies dealing with other subject matters). In this case, Congress by law provided that the time for recognition, if the Commissioner adopted a regulation, would be "such other time as may be prescribed in regulations."[49] And Congress empowered the Commissioner to issue regulations without notice and comment, such as the temporary regulation the Commissioner issued here.[50] This is an express delegation of authority, and the temporary regulation is neither arbitrary nor capricious,[51] so it stands.[52]

**46.**   *See* 26 C.F.R. § 1.267(f)–1T(c)(6) (1984).

**47.**   *See id.* §§ 1.267(f)–1(a)(2), 1.1502–13(f) (2001).

**48.**   *See* 5 U.S.C. § 553 (2000) ("General notice of proposed rule making shall be published in the Federal Register.... After notice ..., the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments ....").

**49.**   26 U.S.C. § 267(f)(2)(B).

**50.**   *See* 5 U.S.C. § 553(b) ("Except when notice or hearing is required by statute, this subsection does not apply ... when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.").

**51.**   *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative

regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.")

**52.**   *See Redlark v. Comm'r of Internal Revenue,* 141 F.3d 936, 939 (9th Cir.1998) (reviewing temporary Treasury regulation and stating that "Only if the [Internal Revenue Code] has a meaning that is clear, unambiguous, and in conflict with a regulation does a court have the authority to reject the Commissioner's reasoned interpretation and invalidate the regulation."); *Walthall v. United States,* 131 F.3d 1289, 1297 (9th Cir.1997) (reviewing temporary Treasury regulation and stating that "[t]he statute is not susceptible only to the [appellant's] interpretation; the IRS's interpretation ... is reasonable. We must therefore show the IRS interpretation substantial deference."). *See also E. Norman Peterson Marital Trust v. Comm'r,* 78 F.3d 795, 798 (2d Cir.1996) ("Until the passage of final regulations, temporary regulations are entitled to the same weight we accord to final regulations."); *McDonnell v. United States,* 180 F.3d 721, 722–23 (6th Cir.1999) (upholding temporary Treasury regulation under *Chevron*); *Allen v. United States,* 173 F.3d 533, 537–38 (4th Cir.1999) (same); *Miller v. United States,* 65 F.3d 687, 689–90 (8th Cir. 1995) (same).

The regulation arguably would be arbitrary if it not only denied the loss to the seller within the controlled group if it ceased to be a member while the property was still owned by another member, as it does, but denied the loss to *anyone*. That is, if the loss were altogether disallowed, that might be inconsistent with the Congressional directive that it be deferred rather than disallowed. But the temporary regulation doesn't do that. It gives the benefit of the loss to the member of the controlled group that bought the property, by increasing its basis by the amount of the seller's deferred loss. Thus when the property does eventually get sold to an outsider, the loss is recognized. In this case, no one got the benefit. But that wasn't because of the temporary regulation. It was because British tax authorities wouldn't give Standard the increased basis. Standard, which owned Union Bank, and which owned the loan portfolio when Union Bank left the controlled group, was a British corporation. Under American, but not British, tax law, when Standard sold the loan portfolio, it would be entitled to have its basis increased by the amount of Union Bank's deferred loss. That is not a failure of the temporary regulation to conform to the statute. Rather, it is a difference between British and American taxation.

## B. The treasure.

■ UnionBanCal argues that the temporary regulation is invalid because it violates the 1975 United States–United Kingdom Tax Convention.[53] Article 24 of the treaty, "Nondiscrimination," generally prohibits either state from subjecting nation-

als of one residing in the other to more burdensome taxation than their own resident nationals. The subsection dealing with corporate subsidiaries likewise *provides* that enterprises of one state owned or controlled by residents of the other "shall not be subjected to ... any taxation or any requirement connected therewith which is other or more burdensome than the taxation and connected requirements to which other similar enterprises of the first-mentioned state are or may be subjected."[54] Thus an American subsidiary of a British corporation can't be taxed more heavily than an American subsidiary of an American corporation.

UnionBancCal's argument is that, because Standard was British and it was American, they wound up worse off than if they had both been American. That doesn't violate the Treaty. UnionBancCal doesn't show that the United States imposed "more burdensome" taxation or requirements on British-owned subsidiaries than American-owned subsidiaries, which is what the treaty addresses. It was merely fortuitous that, because the British and American tax authorities could not agree on how to recognize the deferred loss, Union–BanCal and Standard were worse off than if they had been entirely of one country or the other.

True, UnionBanCal never got tax recognition of its loss on its sale of the loan portfolio to Standard because of the American statute and temporary regulation. But it hasn't shown that it would have been treated any differently had Standard been American. It would have been treat-

---

**53.** Convention between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and

Capital Gains, December 31, 1975, 31 U.S.T. (Part 6) 5668, T.I.A.S. 9682, *reprinted in* 1980–1 C.B. 394 (entered into force April 25, 1980).

**54.** *Id.*, art. 24, para. 5.

ed the same. And discrimination against foreign-owned subsidiaries is all that the nondiscrimination clause at issue protected it against.

## C. Retroactivity.

■ The final regulation provides that the temporary regulation still applies to transactions occurring before July 12, 1995.[55] Union argues that the Commissioner was obligated to make the 1995 final regulation retroactive to its 1988 tax return.

Under 26 U.S.C. § 7805(b), as in effect during the relevant time, the Commissioner "may prescribe the extent, if any, to which any ruling or regulation, relating to internal revenue laws, shall be applied without retroactive effect."[56] The Commissioner plainly did just that in the provision specifying non-applicability of the final regulation to transactions before July 12, 1995.

That this was within the Commissioner's authority is unarguable. The authority is the "may prescribe" statute. That non-retroactivity was within the Commissioner's discretion, and not arbitrary, is also unarguable. Prospective application was reasonable to avoid disturbing transactions and tax returns based on what had been settled law since the Temporary Regulation was promulgated in 1984.

**AFFIRMED.**

THOMAS, Circuit Judge, dissenting:

Although the majority's analysis is thoughtful and insightful, I conclude that the plain words of the governing statute and the final agency regulation interpreting it are at odds with the temporary regulation upon which the Commissioner relied in denying the deductions in this case. Therefore, I must respectfully dissent.

Our review of an administrative agency's construction of the statute it administers is governed by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), as explained in *Food and Drug Administration v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000).

Under *Chevron,* we must consider first "whether Congress has directly spoken to the precise question at issue." *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778. "If Congress has done so, the inquiry is at an end; the court 'must give effect to the unambiguously expressed intent of Congress.'" *Brown & Williamson,* 529 U.S. at 132, 120 S.Ct. 1291 (quoting *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778).

In making that assessment, we look not only at the statutory section in question, but analyze the provision in the context of the governing statute as a whole, *see id.* at 132, 120 S.Ct. 1291, presuming congressional intent to create a "symmetrical and coherent regulatory scheme." *Id.* at 133, 120 S.Ct. 1291 (quoting *Gustafson v. Alloyd Co.,* 513 U.S. 561, 569, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995)).

In this case, both the plain words and the structure of the statute indicate that Congress intended that deductions for the losses at issue be deferred, but not denied. In short, the temporary regulation denying deductions for the losses contradicts the statute; thus, we cannot defer to the agency's interpretation of it. "[A]n agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear." *MCI Telecommunications Corp. v. American Tel. &*

---

**55.** *See* 26 C.F.R. § 1.267(f)–1(*l*)(3).

**56.** 26 U.S.C. § 7805(b) (1994).

*Tel. Co.*, 512 U.S. 218, 229, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994).

Under the law as it existed prior to 1984, sellers were denied deductions for losses from the direct or indirect sale or exchange of property with certain specified affiliated entities which had a unity of economic interest with the seller. In the Tax Reform Act of 1984, Congress expanded the statute to include "controlled groups," including corporations in which fifty percent (50%) or more of the shares of common stock were owned by a common parent company. Pub. L. No. 98–369, § 174(b)(2)(B); 98 Stat. 494, 706. As to these controlled groups, Congress provided for a deferral, rather than disallowance of loss in 26 U.S.C. § 267(f)(2):

> DEFERRAL (RATHER THAN DENIAL) OF LOSS FROM SALE OR EXCHANGE BETWEEN MEMBERS.—In the case of any loss from the sale or exchange of property which is between members of the same controlled group and to which subsection (a)(1) applies (determined without regard to this paragraph, but with regard to paragraph (3))—
>
> (A) subsections (a)(1) and (d) shall not apply to such loss, but
>
> (B) such loss shall be deferred until the property is transferred outside such controlled group and there would be recognition of loss under consolidated return principles or until such time as may be prescribed in the regulations.

Under this statute, and the final regulations promulgated thereunder, a loss realized by a member of a controlled group on a sale to another member of a controlled group is deferred until the seller, the purchaser and the property are no longer all in the same controlled group. Under the final regulations, the deferred deduction is restored to the seller when the seller leaves the controlled group. Treas. Reg. § 1.1502–13; Treas. Reg. § 1.267(f)–1(c).

However, under temporary regulations promulgated immediately after enactment of the 1984 amendments, a seller's deferred loss deduction is forever denied to the seller if the sold property has not been transferred outside the controlled group when the seller leaves the controlled group. Temp. Treas. Reg. § 1.267(f)–1T.

The temporary regulation is at odds with the governing statutory language because the loss is denied under the temporary regulation, not deferred as the statute requires. Put another way, the statute authorizes the Commissioner to establish rules relating to the timing of loss recognition; it does not allow the Commissioner to deny the deduction. "DEFERRAL (RATHER THAN DENIAL)" does not mean "DENIAL (RATHER THAN DEFERRAL)." "Until such time" does not mean "never."

"A regulation may not serve to amend a statute, *Koshland v. Helvering*, 298 U.S. 441, 447, 56 S.Ct. 767, 770, 80 L.Ed. 1268 (1936), nor add to the statute 'something which is not there.'" *California Cosmetology Coalition v. Riley*, 110 F.3d 1454, 1460–61 (9th Cir.1997) (quoting *United States v. Calamaro*, 354 U.S. 351, 359, 77 S.Ct. 1138, 1 L.Ed.2d 1394 (1957)). The temporary regulation does precisely that. *Chevron* deference to agency interpretation is only appropriate when the statutory language is ambiguous and leaves "gaps" to be filled by regulation. When the statute is clear, we "must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778.

Even if we direct our gaze beyond the bare words of the law and survey the statutory context, the result is the same. The government's underlying theory, adopted by the tax court, is that the loss belongs to the controlled group, rather

than any specific entity. However, as the taxpayer rightly argues here, amorphous controlled groups are not taxpayers, do not file tax returns and are not entitled to deductions. As a general principle, "[a]bsent a specific statute to the contrary, a loss deduction may only be taken by the party bearing the expense." *Tennessee Securities, Inc. v. Commissioner,* 674 F.2d 570, 574 (6th Cir.1982) (citing *Calvin v. United States,* 354 F.2d 202, 204 (10th Cir.1965)). That truism must, of course, be tempered in the complex context of a multinational controlled group setting. However, there is nothing in the words of the governing statute, nor in its structure, nor in its legislative history that would urge a contrary interpretation. Indeed, to construe the statute as the temporary regulation did would require us to embrace the concept of a loss unattached to any specific taxpaying entity—a "free-floating loss" in the words of the tax court—which might well materialize in a different form, such as an increase in another taxpayer's basis. In my estimation, such an ethereal construction of a levitating loss untethered to a taxpayer has slipped its statutory moorings.

All of these creative constructs might have retained some credibility if the Commissioner had not completely changed analytic course. In the final regulation pertaining to § 267(f)(2), the Commissioner corrected the interpretative error contained in the temporary regulation, and provided for allowance of the very deduction at issue here. This interpretive change of heart, however, does not affect this transaction because the Commissioner made the regulation effective prospectively; it did not apply to those transactions governed by the temporary regulation.

For this reason, even if the statutory language were ambiguous, we would owe little deference to the agency's earlier erroneous interpretation. Inconsistent agency interpretations are entitled to less judicial deference than consistently held positions. *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446 n. 3, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). If an agency changes its statutory interpretation, and provides a reasoned analysis, the *new*—not the old—interpretation is entitled to some deference. *See Rust v. Sullivan,* 500 U.S. 173, 187, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (citing *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,* 463 U.S. 29, 42, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)); *Bicycle Trails Council of Marin v. Babbitt,* 82 F.3d 1445, 1456 (9th Cir.1996).

Of course, the shift of agency position puts the taxpayer in the extremely inequitable position of being subject to an agency interpretation of a statute which the agency itself has repudiated. With a loss of almost $90,000,000 in the balance, one can hardly blame the taxpayer for not being amused at the irony.

In sum, although I find the majority's analysis excellent, in the end I cannot subscribe to the Commissioner's view in this case. Thus, I must regretfully differ and respectfully dissent.